**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **FREDERICK BURNS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 3:12-00808** |
| **v.** ) | **Nixon/Brown** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

This action was brought under to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review

of the final decision of the Social Security Administration (SSA), through its Commissioner (the

Commissioner), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title

II of the Social Security Act (the Act), 42 U.S.C. §§ 416(i), 423(d), and Supplemental Security

Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*.  For the reasons explained

herein, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the record (DE

12) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on February 18, 2009 alleging a disability onset

date of December 15, 2007.[1]  (Doc. 10, pp. 154-63)  Plaintiff's applications were denied on March

20, 2009 and again upon reconsideration on August 27, 2009.  (Doc. 10, pp. 72-75)

Plaintiff filed a request for a hearing which was held on December 8, 2010 before ALJ Brian

Dougherty.  (Doc. 10, pp. 30-59, 93-95)  The ALJ entered a partially favorable decision on

---

[1]  The Administrative Law judge (ALJ) later amended the alleged disability onset date to July 15, 2007.  (Doc. 10, pp. 12, 17, 18, 20, 33-34)

December 29, 2010.  The ALJ determined that plaintiff was not disabled for purposes of DIB and SSI through December 31, 2007, but that he was disabled for purposes of SSI beginning November 27, 2010.  (Doc. 10, pp. 21-22)

Plaintiff filed a request with the Review Council on February 17, 2011 seeking review of the ALJ's decision.  (Doc. 10, p. 7)  The Appeals Council denied the request on June 7, 2012 (Doc. 10, pp. 1-6), whereupon the ALJ's decision became the final decision of the Commissioner.

Plaintiff filed this action on August 3, 2012 seeking judicial review of the Commissioner's decision.  (Doc. 1)  Plaintiff filed a motion for judgment on the administrative record on November 14, 2012 (Doc. 12), to which the Commissioner responded on December 14, 2012 (Doc. 13), and plaintiff replied on January 7, 2013 (Doc. 16).  This matter is now properly before the court.

## II.  REVIEW OF THE RECORD

### A.  Relevant Medical Evidence

Plaintiff was given a physical at Vine Hill Community Clinic (Vine Hill) on April 23, 2002. (Doc. 10, pp. 259-60)  Plaintiff was "in no apparent distress" at the time, and apart from reporting that he experienced "back pain after overuse," his physical condition was described as normal.

Plaintiff was seen at Vine Hill on May 22, 2002 for back pain.  (Doc. 10, pp. 256-57)  The treatment record notes that plaintiff's "back 'gives out' two or three times a year," he "denies any pain down the legs," he has "more frequent pain when he stands for long periods of time," he was "in no apparent distress" at the time, "[h]is gait [wa]s normal," and although  he reported "[c]ontinued back pain," there was no "no evidence of pain . . . upon examination."

Imaging on July 5, 2002 revealed that plaintiff had an "annular tear" at the L4-L5 vertebrae, that a zone of hyperintensity "extend[ed] slightly to the right," and that there were "[m]ild . . . arthritic changes . . . involving the L5-S1 level."  (Doc. 10, p. 256)

Plaintiff was seen at Vine Hill for back pain and shoulder pain on October 21, 2002. (Doc. 10, pp. 254-56) The treatment record shows that plaintiff was in "no acute distress," exhibited "full range of motion in all joints spine and surrounding tissues," exhibited "decreased quad and plantar strength . . . at [the] knee and achilles . . . ," but "[n]ormal strength and reflexes" bilaterally in both his upper and lower extremities.

Plaintiff was seen at Vine Hill on December 27, 2002. (Doc. 10, pp. 252-53) Plaintiff reported that he "[c]ontinue[d] to experience severe pain in [the] lower back." The treatment record reflects that plaintiff "walk[ed] with a limp and obvious pain," but that he was in no "acute distress" at the time of the examination.

Plaintiff was seen at Vine Hill on January 8, 2003 for back pain followup. (Doc. 10, pp. 251-52) The treatment record shows that plaintiff was in "no acute distress."

Plaintiff was seen at Vine Hill on April 28, 2004 for a check up. (Doc. 10, pp. 249-50) The treatment record reflects that he was in "no acute distress."

On May 30, 2004, plaintiff was seen at the Vanderbilt University Medical Center (Vanderbilt) emergency department (ED) for "a foreign body sensation and eye pain." (Doc. 10, pp. 265-66) The treatment record notes that plaintiff was in "no acute distress" at the time, and that he "state[d] he had been working on a car replacing some brakes [and] that . . . some dust . . . might have caused the symptoms . . . ."

Plaintiff was seen at Vine Hill on August 4, 2004 for "lots" of pain in his left shoulder and right hand. (Doc. 10, pp. 247-48) The treatment record shows that plaintiff was "seated comfortably in no distress." The treatment record also notes that plaintiff was working "part time . . . doing janitorial work."

An MRI of plaintiff's shoulder made on November 13, 2004 was compared to an MRI made

on October 19, 2001.  (Doc. 10, p. 247)  The 2004 MRI revealed a "longitudinal, intrasubstance tear of the posterior aspect of the supraspinatus"[2] tendon, tendinitis, "mild degenerative changes at the acromioclavicaluar joint,"[3] and a "[s]mall amount of fluid in the subdeltoid/subacromial bursa."[4] The remaining structures of the rotator cuff were within normal limits.

Plaintiff was referred to Dr. John Kuhn, M.D. at Vanderbilt on December 1, 2004 to be examined in connection with the November 13th MRI.  (Doc. 10, p. 263)  Dr. Kuhn recorded the following observations in the treatment notes:

> [Plaintiff] has full range of motion of his shoulder, but he does have tenderness at the supraspinatus.  It demonstrates an inability to internally rotate his shoulder with the arm abducted, but later I was able to get him to do that and he had normal internal rotation reaching his stomach to back.  There is some question about his ability to cooperate with the exam.  He had great muscle development.  On exam he had good strength.  An MRI scan showed a little bit of fluid in the joint, but very minimal.  His supraspinatus has an intrasubstance split, but otherwise it is intact and looks very healthy.  He does not have a lot of subacrominal fluid.  His AC[5] joint looks fairly normal for a 44-year-old gentleman.  These findings on his MRI would be normal for a 44-year-old gentleman.  He has signs and symptoms of rotator cuff tendinitis and there is some question about his ability to cooperate with the exam.

---

[2]  The supraspinatus muscle runs horizontally from the top of the scapula to the top of the humerus. *Dorland's Illustrated Medical Dictionary* 1211 (32nd ed. 2012).  The supraspinatus tendon is the tendon that connects the supraspinatus muscle to the top of the humerus and to the clavicle. *See Dorland's* 1193, 1201.  An intrasubstance tear is a partial tear of a tendon or cartilage that occurs in the middle layers of the tissue but does not extend to the surface layers. *See Dorland's* 953, 1793.  A "longitudinal intrasubstance tear" to the "posterior aspect" of the supraspinatus tendon is, therefore, an internal tendon tear at the point where the tendon attaches the supraspinatus muscle to the back of the top of the humerus.

[3]  Acromion – "the lateral extension of the scapula, projecting over the shoulder joint . . . forming the highest point of the shoulder." *Dorland's* 20.  Acromioclavicular – "pertaining to the acromion and clavicle, especially to the articulation between the acromion and clavicle." *Dorland's* 20.

[4]  Subdeltoid – "beneath the deltoid muscle." *Dorland's* 1790.  Subacromial – beneath the acromial process of the scapula, *i.e.*, the highest point of the shoulder. *See Dorland's* 20, 935, 1789.  Bursa – "a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." *Dorland's* 262.

[5]  AC – "acromioclavicular." *Dorland's* 8.

4

On December 31, 2004, plaintiff was seen by Dr. R. Jason Thurman, M.D. at the Vanderbilt ED for a toothache. (Doc. 10, pp. 262-63) The treatment record indicates that plaintiff "move[d] all extremities well."

Dr. Roy Johnson, M.D. conducted a consultative examination of plaintiff on April 23, 2008. (DE 10, pp. 272-73) Dr. Johnson observed that plaintiff was " in no acute distress," that he was able to "get on and off the exam table without assistance," that spinal "[f]lextion [was] 15 degrees, extension 10 degrees, right and left flexion 15 degrees bilaterally," that his visual acuity without glasses was 20/50 in his right eye, 20/50 in his left eye, 20/50 together, and that his "[g]ait was stiff and guarded." Dr. Johnson provided the following narrative assessment of plaintiff's ability to work based on his examination:

> Mr. Burns may occasionally lift 15 pounds. He should avoid repetitive bending of the back. He has no sitting restrictions at this time. He may stand and walk for 4 hours of an 8-hour shift with normal breaks. He should continue to see his doctor in regard to various medical conditions and his working activity should not exceed any restrictions placed on him by his treating physicians.

Dr. Joe Allison, M.D. completed a physical residual functional capacity (RFC) assessment on May 27, 2008. (Doc. 10, pp. 275-82) Dr. Allison determined that Dr. Johnson's assessment that plaintiff could only lift 15 pounds occasionally was "too restrictive based on [his] subjective findings." Dr. Allison concluded that plaintiff was capable of performing moderate work.

Dr. Johnson conducted a second consultative examination on September 3, 2008. (Doc. 10, pp. 284-86) Dr. Johnson noted that plaintiff was in "no acute distress," that he was able to "get on and off the examining table without assistance," that his visual acuity without glasses was 20/30 in the right eye, 20/40 in the left eye, and 20/30 together. Dr. Johnson recorded spinal flexion limitations of "30 degrees, extension 10 degrees, right lateral flexion 10 degrees, left lateral flexion 10 degrees." Dr. Johnson also noted that plaintiff's left shoulder internal and external rotation was

"unremarkable," that he had [f]ull range of motion of the right shoulder, elbows, wrists, hips, knees, and ankles bilaterally" and that, although plaintiff "state[d] it [wa]s hard for him to grip items," his "[d]exterity [wa]s unremarkable." Dr. Johnson also noted a limp in Plaintiff's gait, that he could not squat or rise, and that he could balance on one foot only briefly. Dr. Johnson set forth the following limitations in his second assessment:

> Mr. Burns may lift occasionally 15 pounds. He may stand and walk for up to four hours with regular sitting breaks. He has no sitting restrictions at this time. He should continue to see his doctor in regards to his various medical conditions, and his work activity should not exceed any restrictions placed on him by his treating physician

Dr. Keith Junior, M.D. treated plaintiff for back pain on November 21, 2008. (Doc. 10, pp. 343-44) The treatment record shows that plaintiff was in "[n]o acute distress," that he described the pain in his right hand as "mild," the pain in his right foot, both legs, and back as "moderate," and that he had full range of motion in all extremities.

Dr. Junior saw plaintiff on a follow-up for back pain on December 1, 2008. (Doc. 10, p. 341-42) The treatment record shows that plaintiff was in "[n]o apparent distress," and that he described his back pain as "aching."

Dr. Junior saw plaintiff with respect to test results pertaining to his back and shoulder pain on January 9, 2009. (Doc. 10, p. 338) The treatment record describes plaintiff's shoulder and knee pain as "moderate," and that the "pain radiating to [the] right leg" was "moderate" as well.

X-rays were made of plaintiff's lower back, knees, and left shoulder at the Nashville General Hospital at Meharry (Meharry) on January 13, 2009. (Doc. 10, pp. 287-291) X-rays of plaintiff's back revealed "no focal, lytic, or sclerotic osseous lesions" or "paraspinal masses."[6] The x-rays

---

[6] Focal (focus) – "the chief center of a morbid process." *Dorland's* 723. Lytic – "pertaining to lysis," *i.e.* "dissolution or destruction of an organ or structure, such as the destruction of bone by loss of calcium . . . ." *Dorland's*

showed an "anterior wedge deformity of L1 of undetermined age," "narrowing of the L4-5 disc space consistent with degenerative disc disease," and that "[a]nterior osteophytes[7] [we]re present . . . ." X-rays of plaintiff's knees revealed "mild compartment narrowing bilaterally consistent with osteoarthritic change," that the "osseous structures appear normal in density," that there was "no evidence to suggest joint effusion,"[8] and that the "soft tissues [we]re within normal limits." X-rays of plaintiff's left shoulder revealed "mild narrowing of the glenohumeral[9] joint suggesting mild osteoarthric change," "mild narrowing at the AC joint," but no "cortical disruptions to suggest acute fracture," and that the "left hemithorax[10] [wa]s intact."

Dr. Junior saw plaintiff on January 16, 2009 to go over the x-rays made at Meharry. (Doc. 10, p. 339) The treatment record described plaintiff as "in no apparent distress," pain in his left toe as "mild," the pain in his knees as "moderate," the pain in his lower back and left shoulder as "moderate," no pain radiating down his leg from his back, mildly reduced range of motion in the left shoulder, and full range of motion in his knees.

Dr. Junior saw plaintiff on February 27, 2009. (Doc. 10, p. 337) The treatment record describes the pain in plaintiff's knees and left shoulder as "moderate." Dr. Junior diagnosed plaintiff as having "only mild to moderate disease" of the lower back.

Dr. Kanika Chaudhuri, M.D. performed a second physical RFC assessment on May 20, 2009.

---

1089-90. Sclerotic – "hard, or hardening . . . ." *Dorland's* 1681. Osseous – "bony." *Dorland's* 1343. Paraspinal – "near the spine . . . ." *Dorland's* 1381.

[7] Osteophyte – "a bony excrescence [an abnormal outgrowth] or osseous outgrowth." *Dorland's* 657, 1348.

[8] Effusion – "the escape of fluid into a part or tissue . . . ." *Dorland's* 595.

[9] Glenohumeral – "pertaining to the [socket] cavity of the humerus [the bone that extends from the shoulder to the elbow]," *i.e.*, the shoulder joint. *Dorland's* 783, 873.

[10] Hemithorax – "one side of the chest." *Dorland's* 838.

(Doc. 10, pp. 293-305)  Dr. Chaudhuri concluded that plaintiff's RFC was "light."

Plaintiff was a walk-in patient at Meharry on June 17, 2009 complaining of soft-tissue injury to his right knee.  (Doc. 10, pp. 315-20)  The treatment record shows that plaintiff was able to "walk without assistance but with some difficulty," his "foot and ankle [we]re normal," he reported "[d]evelop[ing] symptoms of injury after overexerting while walking," he "appear[ed] to be comfortable," he demonstrated "[f]ull range of motion in all extremities," and he was "ambulatory with [a] cane."  An x-ray of plaintiff's knee showed that "[t]he osseoous structures [we]re intact without evidence of acute fracture or dislocation," that there was "some compartment narrowing and osteophyte formation consistent with osteoarthritic change," but that the soft tissues were "unremarkable."

Dr. Christopher Fletcher, M.D. affirmed Dr. Chaudhuri's May 20, 2009 "light" RFC assessment on August 26, 2009.  (Doc. 10, p. 321)

Dr. Junior saw plaintiff on September 14, 2009 for a follow up on plaintiff's back and shoulder pain.  (Doc. 10, pp. 335-36)  The treatment record shows that plaintiff complained of left shoulder, knee, and arm aches, but that he appeared to be in "[n]o apparent distress" at the time.  The treatment record also shows that plaintiff exhibited no tenderness in his cervical and thoracic spine, and that both exhibited normal mobility and curvature.  Plaintiff's lumbar spine was tender with "mildly reduced" range of motion.

Dr. Junior saw plaintiff on September 25, 2009.  (Doc. 10, p. 333) X-rays revealed "L-4-L-5 degenerative Disc disease, spondylosis, [and] mild osteopenia."

Dr. Junior saw plaintiff on October 30, 2009 for back pain.  (Doc. 10, p. 334) An x-ray taken

that day "show[ed] L4-L5 degenerative disc disease, spondylosis,[11] and mild osteopenia[12]."

Plaintiff went to the Vanderbilt ED on December 9, 2009 for back pain. (Doc. 10, pp. 322-28) The following relevant notations appear in the treatment record: 1) "[w]orks in janitorial service"; "no acute distress"; "tender over the lumbosacral area in midline"; "[m]otor strength 5/5"; "[g]ait normal"; "walks [wi]th steady gait"; "[e]xtremities [n]ormal x 4"; "[s]trength 5/5 in upper and lower extremities." An x-ray of plaintiff's lumbar spine revealed the following:

> [M]oderate hypertrophic[13] and degenerative changes in the T11-12 and L4-5 discovetebral joints, and in several lower lumbar dicovertebral joints. There are mild hypertrophic and degenerative changes in the T-12-L-1 discovertebral[14] joint. The images show mild wedge shape or deformity of L1. Disc shape has not changed since at least 2002, and does not represent an acute injury.

Dr. Junior saw plaintiff on December 14, 2009 to follow up on plaintiff's back pain. (Doc. 10, pp. 331-32) The treatment record shows that plaintiff had "moderate" lower back pain "occasionally," that the problem "fluctuat[es], " and that it was aggravated by bending, climbing stairs, and walking. The treatment record also shows that plaintiff claimed to be experiencing spasms, tenderness, tingling, and numbness in his legs. The treatment record shows, however, that he had "[n]o back or joint pain" that day.

Dr. Ojiungo Iko, M.D. saw plaintiff on February 26, 2010 for lower back pain and pain that "radiating to [the] right leg." (Doc. 10, pp. 329-30) Radiological images showed degenerative disc disease. Plaintiff was observed to "[a]mbulate with a cane."

---

[11] Spondylosis – "degenerative spinal changes due to osteoarthritis." *Dorland's* 1754.

[12] Osteopenia – "any decrease in bone mass below the normal . . . ." *Dorland's* 1347-48.

[13] Hypertrophic – "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." *Dorland's* 898.

[14] Discovertebral joint – the joint formed by the vertebrae and the discs.

Plaintiff was examined by Dr. Mark Braxton, Jr. on June 15, 2010.[15] (Doc. 10, p. 348) Dr. Braxton noted in the treatment record that plaintiff "denie[d] any radicular symptoms down the legs, any weakness of legs or arms, or . . . feelings of legs giving out." Dr. Braxton noted further that plaintiff had "mild tenderness to palpitation over the levels L3-S1, more significant L4-L5, however no radicular symptoms were elicited on any other physical examination." Dr. Braxton "encouraged [Plaintiff] to become more active," that increased activity "w[ould] help his overall prognosis," and that an MRI was "not indicated at this point without any radicular symptoms."

There are 6 reports of physical therapy in the record covering the period July 19, 2010 through August 16, 2010. (Doc. 10, pp. 350-59) Plaintiff tolerated therapy well during the first two sessions, but experienced pain in the lumbar region in the other four after doing press-up exercises. On August 10, 2010, Dr. Able recorded plaintiff's pain as the "[w]orst pain imaginable," noted that plaintiff reported pain down both legs, and ordered an MRI.[16] (Doc. 10, pp. 358-59)

On August 31, 2010, Dr. Able completed a medical source statement (MSS) regarding plaintiff's back. (Doc. 10, 360-65) Dr. Able opined that plaintiff was able to lift and/or carry up to 20 pounds occasionally, but never heavier, that he could sit 2 hours, and stand and/or walk for 1 hour at one time without interruption, that those postural limitations applied to an 8-hour workday as well,[17] and that he did not require a cane to ambulate. Dr. Able also noted that plaintiff could balance, climb stairs, ramps, ladders, and scaffolds occasionally, but never stoop, kneel, crouch, or crawl, that he could reach overhead in all directions and push/pull occasionally, that he could handle, finger, and feel frequently with his right hand, and that he could use foot controls only occasionally.

---

[15] Although not entirely clear, it appears that Dr. Antoinne Able, M.D. referred plaintiff to Dr. Braxton.

[16] This is the first and only treatment record attributable to Dr. Able.

[17] Although Dr. Able refers to the MRI noted above in the MSS (Doc. 10, pp. 360, 362), *i.e.*, that it "show[ed]"/"suggest[ed]" spinal stenosis, the actual results/interpretation of the MRI are not in the record.

In addition to the foregoing, Dr. Able noted that plaintiff could never be exposed to unprotected heights or vibrations, that he could occasionally be exposed to moving mechanical parts, operating motor vehicles, humidity and wetness, extreme could, and extreme heat, but that he could be exposed frequently to dust, odors, fumes and pulmonary irritants. Finally, Dr. Able reported that plaintiff had no visual impairments, and was able to perform all of the daily living activities listed in the MSS.

## B. Administrative Proceedings Below

### 1. December 8, 2010 Hearing

#### a. Plaintiff's Testimony

Upon questioning by the ALJ, plaintiff testified that he was shot in 1999, twice in his left leg, once in the right foot, and once in his right hand. (Doc. 10, pp. 38-41) The gunshot wound to his hand went through the knuckle. Plaintiff claimed that he could not grip or hold anything because he no longer had that knuckle. The gunshot wound also went through the top of his foot, and his foot hurt worse than his leg. He could not stand for long because his foot "cramp[ed] a lot," a limitation allegedly made worse by disc problems in his back that caused his right leg to become numb. Plaintiff also testified that he had arthritis in both knees, and that "they hurt."

Returning to his back pain, plaintiff testified that he had two bulging discs in his lower back, and two discs with degenerative disc disease, one or more of which "hit[] the nerve" that went down his right leg, and "every so often" his leg would "go numb," and he would have to "catch [him]self to keep from falling." (Doc. 10, p. 42) Dr. Able, whom plaintiff testified had treated him for "[r]oughly, about a year," gave him two steroid injections in the back.

Plaintiff testified that he last worked "around about . . . before football season started" in 2010. (Doc. 10, pp. 42-45) He worked four hours a day for "[a]bout a month" "pressure washing the [Vanderbilt] stadium." Plaintiff testified that he quit that job because of his back problems.

Plaintiff testified that he could stand "roughly"one hour in an eight-hour day before having to sit down. (Doc. 10, p. 44) When asked how he managed to do the pressure washing work, plaintiff gave several answers: there "wasn't nobody there to really watch [him]"; his boss "understood"; he would stand "close to 45 minutes and then . . . take a break"; he would "use the bathroom sit down nor [a]while" and "[t]hen . . . work for about another 30, 40 minutes." (Doc. 10, pp. 44-45)

When asked how long he could sit, plaintiff replied that he could sit "35 to 40 minutes," or until he "start[ed] hurting," then he would "have to get up and move or . . . just get up and walk or whatever." (Doc. 10, pp. 45-46) When asked how long he could walk in a day, plaintiff replied "no further than four blocks, three blocks at the most." Plaintiff testified that he was unable to bend over and pick things up off the floor without holding onto something because of the pain in his back and knees. (Doc. 10, p. 47)

Upon questioning by counsel, plaintiff testified that he could reach overhead with his right arm, but not with his left arm. (Doc. 10, pp. 49-50) Plaintiff explained that he had surgery on his left shoulder, but that the problem had "come back again," and it hurt when he raised his left arm too high. Plaintiff testified that he was right handed, and because he was shot in the right hand, he could not hold a cup of coffee without it slipping, and that he could not pick up a coin off a table.

**b. Vocational Expert's Testimony**

The ALJ posed the following hypothetical to the vocational expert (VE), Pedro Román: "[C]onsider an individual who can occasionally lift 15 pounds, can frequently lift 5 pounds, can stand and walk up to four hours per day, can sit up to eight hours per day. Based on those limitations, would that individual be able to perform any of the past relevant work?" (Doc. 10, p. 54) The VE answered, "No." When asked if there were "other jobs in the regional or national

economy that such a person could perform," the VE answered, "at the full range of sedentary work, yes, but not at the light, exertional level." The VE identified the following sedentary jobs with substantial numbers of positions in the national and regional economy: assembler, charge account clerk, and telephone quotation clerk. (Doc. 10, p. 55)

The ALJ posed the following second hypothetical to the VE:

> I want you to consider the same . . . physical . . . [and] postural limitations . . . . Consider the individual can only engage in overhead reaching with the left arm on an occasional basis, overhead reaching with the right arm on a frequent basis. Consider that the individual should avoid concentrated exposure to heat and humidity and also consider that the individual with his right dominant hand can only occasionally perform a forceful grip. Based on those limitations, does that have any impact on the jobs you've identified?

(Doc. 10, p. 56) The VE testified that the added restrictions would eliminate the assembler job, but not the charge account clerk or telephone quotation clerk jobs. The ALJ then posed the following third hypothetical to the VE:

> I want you to consider an individual who can occasionally lift 20 pounds, frequently lift l0 pounds, who can sit for two hours, no more than two hours per day, can stand . . . for no more than one, walk for no more than one, should engage in no stooping, kneeling, crouching, or crawling, only occasionally climbing and balance, only occasional reaching, pushing and pulling, and operation of food controls. Can engage in frequent handling and fingering, have no exposures to hazards, only occasional exposure to humidity, witness, extreme temperatures, can have frequent exposures to dust, fumes, and other irritant inhalants. Now based on those limitations, would that individual be able to perform any past relevant work?

(Doc. 10, pp. 56-57) The VE replied that the hypothetical individual above would be unable to perform any of the sedentary work available at the national and/or regional economy.

### c. The ALJ's Analysis of the Record

The relevant findings of fact and conclusions of law in the decision relevant to plaintiff's

request for judicial review are summarized below.

The claimant had not engaged in substantial gainful activity since the alleged onset date. (Doc. 10, ¶ 2, p. 15)

The claimant had the following severe impairments since the alleged onset date of July 15, 2007: residuals of multiple gunshot wounds; low back syndrome; degenerative joint disease of the left shoulder; mild osteoarthritis of the right knee and hand; chronic Hepatis C infection. (Doc. 10, ¶ 3, pp. 15-17)

The claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 10, ¶, 4 p. 17)

The claimant has had the RFC to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a). (Doc. 10, ¶ 5, pp. 18-19)

The claimant has been unable to perform any past relevant work since July 15, 2007. (Doc. 10, ¶ 6, p. 20)

Transferability of job skills is not material to the determination of disability prior to November 27, 2010 because applying the Medical-Vocational Rules directly supports a finding of "not disabled" whether the claimant had transferable job skills, or not. Beginning November 27, 2010, the claimant has not been able to transfer job skills to other occupations. (Doc. 10, ¶ 9, p. 20)

Prior to November 27, 2010, the date the claimant's age category changed, considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. (Doc. 10, ¶ 10, pp. 20-12)

Beginning November 27, 2010, the date the claimant's age category changed, considering his age, education, work experience, and RFC, there are no jobs that exist in significant numbers in the national economy that the claimant could perform. (Doc. 10, ¶ 11, p. 21)

The claimant was not disabled prior to November 27, 2010, but became disabled on that date, has continued to be disabled through the date of this decision, and is expected to remain so for more than

12 months.  (Doc. 10, ¶ 12, p. 21)

The claimant was not under a disability within the meaning of the Act at any time through December 31, 2007, the date last insured.  (Doc. 10, ¶ 13, p. 21)

## III. ANALYSIS

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905.  Corresponding regulations outline a five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6ᵗʰ Cir. 2013).  The claimant bears the burden of proof at steps one through four.  *Johnson v. Comm'r of Soc. Sec.* 652 F.3d 646, 651 (6ᵗʰ Cir. 2011).  The burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile.  *Johnson*, 652 F.3d at 651 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6ᵗʰ Cir. 2004)).  The record shows that the ALJ complied with the five-step process.

### C.  Standard of Review

The district court reviews the Commissioner's final decision to determine whether the "Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards."  *Gayheart*, 710 F.3d at 374 (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6ᵗʰ Cir. 2011)).  "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6ᵗʰ Cir. 2007)(quoting *Cutlip v.*

*Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). Even if the evidence could also support a different conclusion, the Commissioner's decision must stand if substantial evidence supports the conclusion reached. *Rogers*, 486 F.3d at 241 (citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)). More particularly, if the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive "even if there is substantial evidence in the record that would have supported an opposite conclusion" " 42 U.S.C. §§ 405(g), 1383(c); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405-06 (6th Cir. 2009)(citing *Key v. Callahan*, 109 F.3d 270, 273 (1997)).

## IV. Claims of Error

### A. The ALJ Failed to Give the Correct Weight to the Treating Physician Health Providers

Plaintiff asserts that the ALJ failed to give controlling weight to Dr. Able's medical opinion, under whose care plaintiff claimed at the hearing to have been "for more than one year." (Doc 12-1, ¶ VI.A, p. 9) Plaintiff argues further that Dr. Able's opinion was supported by Dr. Johnson's two consultive examinations.

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. §§ 404.1527(c)(2)-(6)).

The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544)).

The ALJ determined that Dr. Able qualified as a treating physician,[18] but that his opinion was not entitled to "significant weight." (Doc. 10, p. 19) Specifically, the ALJ found that plaintiff's part time work pressure washing the Vanderbilt stadium, noted at pp. 11-12, flew in the face of Dr. Able's opinion that plaintiff could not perform even sedentary work. The ALJ's reasoning is clear on its face – anyone who has ever operated a pressure washer, especially over an extended period of time, knows that using a pressure washer requires a level of physical effort that <u>far</u> exceeds the limitations and restrictions that Dr. Able set forth in the MSS. Plaintiff's work at the time pressure washing the Vanderbilt stadium at or about the time[19] Dr. Able wrote the MSS constituted "good reason" for discounting Dr. Able's opinion that plaintiff was not even capable of performing

---

[18] The ALJ characterized Dr. Able as "a treating physician." (Doc. 10, p. 19) However, apart from plaintiff's testimony at the hearing that he had been treated by Dr. Able for more than a year, there is nothing the record to support that characterization. As previously noted at p. 10 n. 15, although it appears that Dr. Able referred plaintiff to Dr. Braxton, the only two medical records before the court that actually are attributable to Dr. Able are, as previously noted at pp. 10-11, the August 10, 2010 treatment record in which Dr. Able ordered an MRI and the August 31, 2010 MSS.

[19] The record supports the conclusion that plaintiff was engaged in water washing the Vanderbilt stadium at or about the time Dr. Able completed the MSS. Plaintiff testified that Dr. Able had been treating him for "[r]oughly . . . about a year" at the time of the hearing, *i.e.*, since "the first part of 2010," and that he worked pressure washing the Vanderbilt stadium for "[a]bout a month" beginning "around about . . . before football season started." (Doc. 10, pp. 43-45, 51) Dr. Able completed the MSS on August 31, 2010. (Doc. 10, pp. 360-65)

sedentary work.[20]  As discussed below at pp. 19-21, the ALJ's decision regarding Dr. Able's opinion also is supported by substantial evidence on the record.

Plaintiff's second argument that Dr. Able's opinion was supported by Dr. Johnson's two consultive examinations is not supported by the record.  Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. . . .  Jobs are sedentary if walking and standing are required occasionally and all other sedentary criteria are met."  20 CFR §§ 404.1567(a) and 416.967(a).  Dr. Johnson's two examinations, noted previously at pp. 5-6, actually support the ALJ's determination that plaintiff was capable of performing the full range of at least sedentary work.

Although not entirely clear, plaintiff also appears to advance a third argument, *i.e.*, that even if plaintiff's job pressure washing the Vanderbilt stadium trumps the restrictions/limitations set forth in the MSS, the ALJ still erred because Dr. Johnson's consultative examinations "clearly stated that the [plaintiff] should not engage in any activity level above the limits stated by his treating physician," *i.e.*, Dr. Able's limitations.  (Doc. 12-1, ¶ VI.A, p. 9)  This argument is frivolous inasmuch as it suggests that an unsupported, non-medical disclaimer of a consulting physician binds the SSA to that disclaimer, in essence superceding the SSA's authority and the "substantial evidence" standard which guides subsequent judicial review.

Before turning to the medical evidence on the record, the Magistrate Judge notes that Dr. Braxton's clinical note dated June 15, 2010, noted at p. 10, was couched solely in the context of plaintiff's lower back pain.  The record physical therapy ordered subsequently, noted at p. 10, focused only on plaintiff's lower back as well.  Dr. Able's August 10, 2010 clinical note, noted at

---

[20]  The ALJ also referred to plaintiff's testimony that he only could walk three blocks as a reason for not giving Dr. Able's opinion controlling weight.  The Magistrate Judge is unsure of the ALJ's intent, but it is unnecessary to dwell on the question.  Plaintiff's admitted work pressure washing the Vanderbilt stadium at or near the time Dr. Able completed his MSS constitutes substantial evidence to support the ALJ's decision to discount Dr. Able's opinion..

p. 10, restricts itself to plaintiff's lower back pain, and the pain that reportedly ran down plaintiff's legs. (Doc. 10, p. 358-59) Finally, the only objective medical evidence to which Dr. Able refers in the MSS is an August 10, 2010 MRI of plaintiff's lumbar spine. From the record, therefore, it is apparent that Dr. Able's opinion in the MSS that plaintiff was unable to perform even sedentary work was based solely on medical opinions pertaining to plaintiff's lower back, and not any of the other physical restrictions/limitations alleged by plaintiff. For these reasons, the Magistrate Judge will address the medical evidence in the context of plaintiff's first claim of error only as that evidence pertains to those elements that comprise plaintiff's lower back problems, *i.e.*, the severity of the disease, the severity of the pain in the lower back, the severity pain radiating into the leg(s), and spinal flexibility/mobility issues.

Severity of the Disease. The medical records show that plaintiff had "mild" to "moderate" disc disease dating back to 2002. Dr. Junior, also a treating physician under the rules, characterized the severity of plaintiff's back-related disease as "only mild to moderate" in February 2009. Dr. Junior's February 2009 diagnosis was based on having examined plaintiff several times, his analysis of imaging results of plaintiff's lower back, and his translation of both into the specific diagnosis that plaintiff had "only mild to moderate disease." Dr. Able's MSS, on the other hand, is both conclusory and speculative – conclusory because Dr. Able simply refers to the August 10 MRI that he ordered without elaboration, and speculative because he wrote "suggest[s] spinal stenosis" in the MSS, the inference being uncertainty in the diagnosis. As explained above, Dr. Able's opinion is not entitled controlling weight *vis-a-vis* Dr. Junior's diagnosis.

Severity of the Lower Back Pain. Plaintiff characterized his back pain as "severe" on December 27, 2002, and as the "[w]orst pain imaginable" on August 10, 2010. In the many years in between, however, plaintiff consistently reported his back pain as "mild" to "moderate," and was

observed to be in "no distress"/"no acute distress" each time he sought treatment related to his back pain. As recently as December 14, 2009, plaintiff described the frequency of his lower back pain as "occasional[]," noting no back pain at all on that date. There is nothing in the medical record that would suggest that plaintiff's back pain is anything but occasional, and when it does occur, that it is anything but "mild" to "moderate."[21]

Severity of the Leg Pain. Plaintiff "denied" any back-related leg pain in the single instance that he sought treatment for lower back pain in 2002. The subsequent related entries in the record begin with Dr. Johnson's April 23 and September 3, 2008 consultative examinations. However, Dr. Johnson's statement in the first report that plaintiff "state[d]" the pain in his lower back radiated down his left leg, and in the second report that plaintiff "report[ed]" he had "right leg radiation of pain," show that Dr. Johnson's reports on this point were based on what plaintiff told him, not on any objective medical evidence. Moreover, Dr. Johnson made no effort to validate plaintiff's claim of pain down his leg(s) during either of the two physical examinations that he conducted. Of the other remaining related entries in the record, two are silent on plaintiff's subjective assessment of severity, two characterize the severity of the pain as "moderate," and on June 15, 2010 plaintiff denied any pain at all. That plaintiff either had no pain, or that the pain that he reported was "moderate," is supported by the fact that nowhere in any of the treatment records where plaintiff mentions/reports back-related leg pain was it ever noted that plaintiff was in any kind of distress due to that pain.

Range of Motion. The record shows that plaintiff had "limited" to "full range" of motion in his spine in 2002. Although Dr. Johnson later reported in his two consultative examinations that

---

[21] The physical therapy records noted at p. 10 show that plaintiff's "[w]orst pain imaginable" occurred after doing press-up exercises. Press-up exercises exceed the restrictions/limitations applicable to sedentary work. In other words, the fact that plaintiff experienced severe back pain while doing press-up exercises does not establish his inability to do sedentary work.

plaintiff exhibited limited range of motion in his back, Dr. Junior noted a year later on September 14, 2009 that plaintiff had normal mobility and curvature in his cervical and thoracic spine, with only "mildly reduced" range of motion in his lumbar spine. As established above, Dr. Junior treated plaintiff numerous times between November 21, 2008 and December 14, 2009. As a treating physician, Dr. Junior's opinion pertaining to plaintiff's range of motion in his back is entitled to controlling weight *vis-a-vis* Dr. Johnson's much earlier consulting opinion. There is nothing in the medical record subsequent to Dr. Junior's September 14, 2009 entry to suggest that his observation has been, or should be, revised.

As shown above, the ALJ not only gave good reason for not giving Dr. Able's opinion controlling weight, his determination that plaintiff's back-related problems did not preclude him from performing the full range of sedentary work is supported by substantial evidence on the record. Plaintiff's first claim of error is without merit.

## B. The ALJ Erred in Minimizing the Debilitating Effects of Plaintiff's Physical Impairments

Plaintiff argues that the ALJ failed to give adequate consideration to the debilitating effects of his chronic low back pain, shoulder pain, "significantly reduced vision," knee pain, and the effects of the gunshot wounds to his right hand and foot. (Doc. 12-1, ¶ VI.B, pp. 9-10) Plaintiff also repeats his argument that the ALJ failed to give adequate weight to the opinions of Drs. Able and Johnson.

Plaintiff's arguments pertaining to his lower back pain, and the opinions of Drs. Able and Johnson in that respect, have been considered and decided, and will not be addressed again. The discussion below pertains to plaintiff's allegations of shoulder pain, "significantly reduced vision," knee pain, and the residual effects of the gunshot wounds to his right hand and foot. The record shows that, apart from "significantly reduced vision," the ALJ addressed each of these alleged restrictions/limitations, and determined that they did not prevent plaintiff from performing the full

range of sedentary work, a decision supported by substantial evidence on the record as shown below.

Left Shoulder.  The record shows that plaintiff had rotator cuff surgery in 2002.  An MRI of plaintiff's left shoulder was made on November 13, 2004, and compared to one made on October 19, 2001.  In evaluating the 2004 MRI, Dr. Kuhn noted in his clinical notes that "[t]he[] findings on his MRI would be normal for a 44-year old gentleman."  Dr. Kuhn also noted twice that plaintiff did not appear to be cooperating with the exam.  An x-ray study of plaintiff's left shoulder in January 2009 revealed some "mild" changes but the results were otherwise unremarkable.  Plaintiff's subjective assessment of the severity of his shoulder pain throughout the record was that it was "moderate."  However, plaintiff never was observed to be in "distress" when he presented for treatment related to his shoulder.  Finally, the range of motion of plaintiff's left shoulder is described variously as "full range" in 2004, "unremarkable" by Dr. Johnson in 2008, "full range" later in 2008, and both "full range" and "mildly reduced" in 2009.  As summarized above, there is substantial evidence in the record that plaintiff's left shoulder would not prevent him from performing at least the full range of sedentary work.

Significantly Reduced Vision.  Counsel wrote the following in his November 29, 2010 letter to the ALJ: "On May 31, 2004 the claimant was suffering from eye pain and his vision acuity was right 20/100 and left 20/200."  (Doc. 10, p. 238)  This is the only reference in the record to any potential vision-related claim.  Counsel's statement above corresponds to the May 30, 2004 medical record, noted at p. 3, pertaining to "foreign body sensation and eye pain" with respect to which plaintiff  "state[d] he had been working on a car replacing some brakes [and] that some dust . . . might have caused the symptoms."  Lacking an arguable basis in fact, this claim is frivolous.

Plaintiff's Knees.  On April 16, 2009, Dr. Johnson reported that plaintiff had full range of motion in both knees, but that he could not "squat or rise."  The record shows that plaintiff reported

"moderate" knee pain on January 9, 2009. An x-ray made on January 13, 2009 showed "mild compartment narrowing bilaterally," but normal otherwise. Plaintiff again reported "moderate" knee pain on January 16 and February 27, 2009, with "full range of motion" in both knees noted on January 16. Plaintiff suffered a soft tissue injury to his right knee on June 15, 2009 "after overexerting while walking." An x-ray taken on September 21, 2009 revealed "mild" osteoarthritis. As summarized above, there is substantial evidence in the record that plaintiff's knee pain would not prevent him from performing at least the full range of sedentary work.

Right Hand. The medical records show that plaintiff has complained of hand pain off and on since 2002, and that he is unable to bend his thumb at the first joint. However, plaintiff characterized the pain in his right hand as "mild," and Dr. Johnson reported in his September 3, 2008 examination that, although plaintiff "state[d] that it is hard for him to grip items," plaintiff's "[d]exterity [wa]s unremarkable." As summarized above, there is substantial evidence in the record that the gunshot wound to plaintiff's right hand would not prevent him from performing the full range of sedentary work.

Right Foot. As for plaintiff's right foot, Dr. Johnson noted in his April 23, 2008 consultive examination that plaintiff was "unable to stand for long periods of time, " that he could not walk on his toes, and that his gait was "stiff and guarded." On November 21, 2008, plaintiff characterized the severity of the pain in his right foot as "moderate." In his April 16, 2009 examination, Dr. Johnson reported that plaintiff told him "his foot hurts all the time especially with prolonged standing or walking," and that he walked with a limp. Plaintiff's characterization of the pain in his right foot stands in stark contrast with his statement two months later that he injured his knee "after overexerting while walking." As summarized above, there is substantial evidence in the record that the gunshot wound to plaintiff's right foot would not prevent him from performing the full range of

sedentary work.

The medical treatment records associated with plaintiff's left shoulder, knees, right hand and foot, the associated limitations/restrictions described therein, as well as plaintiff's characterization of the severity of his pain, support the conclusion that none of these complaints, either alone or in combination, would preclude plaintiff from performing the full range of sedentary work. Plaintiff's second claim of error is without merit.

### C. The ALJ Did Not Assess the Credibility of Plaintiff's Statements as Required by SSA Ruling 96-7P

Plaintiff argues that, although "the ALJ noted that he used the criteria in Social Security Ruling 96-7P in reaching his decision," he failed to provide the specific "weight he gave to [plaintiff's] statements and the reasons for that weight . . . ." (Doc. 12-1, ¶ VI.C, pp. 10-12) Plaintiff argues further that the ALJ erred in his credibility determination by reasoning that plaintiff "has been able to perform some activity on a very minimal basis." (Doc. 12-1, ¶ VI.C, p. 12)

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)(quoting *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 475 (6th Cir. 2003)). Moreover, the ALJ's credibility determination is accorded "great weight and deference . . . since the ALJ has the opportunity . . . of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 (July 2, 1996).

Social Security regulations prescribe a two-step process for evaluating subjective complaints

of pain. The plaintiff must establish an underlying medical condition, and there must be objective medical evidence to confirm the severity of the alleged pain rising from the condition, or the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. 20 C.F.R. § 404.1529(b) (1995); *Jones v. Secretary of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir.1991)(citing *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986)). If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms. 24 C.F.R. § 404.1529(c) (1995); *Jones*, 945 F.2d at 1369-70. In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living. *Id*

A plain reading of the Notice of Decision shows that the ALJ acknowledged the requirements set forth in SSR 96-7p, and that he complied with the two-part process set forth in SSR 96-7p. More particularly, the ALJ noted that:

> [C]laimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment.

(Doc. 10, p. 19) The ALJ then addressed each of the alleged medical conditions previously discussed in determining that plaintiff was capable of performing the full range of sedentary work.[22]

---

[22] The ALJ resisted impugning plaintiff's credibility on grounds of honesty and integrity. Based on the record before the court, the ALJ could have included that plaintiff had been seeking public benefits continuously since 1978 (Doc. 10, p. 259); that he often presented for medical treatment for the sole purpose of obtaining documentation to qualify for public assistance, *i.e.*, food stamps, disability, subsidized housing, etc. (Doc. 10, p. 249, 255, 251, 265-65); that he was "working on a car replacing some brakes" while one of his several prior applications for DIB and SSI were pending on the same grounds present here, *i.e.*, lower back, shoulder problems, residuals from gunshot wounds, etc.; that he appeared not to cooperate with Dr. Kuhn's examination of his shoulder in 2004; that he was doing janitorial work in 2004 when an earlier application for disability benefits was pending on the same grounds present here; that he reported

While the ALJ did not apportion percentage weights, his findings were unambiguous and sufficiently specific to make clear on subsequent review the weight that he gave to plaintiff's statements and the reasons for giving that weight. Plaintiff's third claim of error is without merit.

## D. The ALJ's RFC Finding Is Not Consistent with the Medical Evidence

Plaintiff argues that the ALJ's RFC determination was inconsistent with the medical evidence for the following reasons: 1) the ALJ failed to give any consideration to the effects of his gunshot wounds to plaintiff's right hand and foot; 2) the ALJ gave improper weight to the fact that plaintiff was working as a pressure washer at the same time; 3) the ALJ only "considered the limited parts of the evidence that supported a finding of not disabled."

As previously discussed, the ALJ gave due consideration to the residual effects of the gunshot wounds to plaintiff's right hand and foot. As previously discussed, the ALJ gave the proper weight to the fact that plaintiff was working pressure washing the Vanderbilt stadium. Finally, there is nothing in the Notice of Decision that supports plaintiff's argument that the ALJ only considered the parts of the record that supported a finding of not disabled. The simple fact is that the record does not support a different determination. Plaintiff's fourth of claim of error is without merit.

## IV. CONCLUSION

The record before the court shows that the ALJ applied applicable policies, procedures, and standards, and that his decision was supported by substantial evidence on the record.

## V. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that the plaintiff's

---

doing "janitorial work" in December 2009, but told Dr. Able in August 2010 that he had not worked in over a year; that he was working pressure washing the Vanderbilt stadium when he told Dr. Able, again in August 2010, that he had not worked in over a year; when his testimony before ALJ Dougherty suggested that he was accepting pay for work that he was not actually performing, etc.

motion for judgment on the administrative record (Doc. 12) be **DENIED**, and that the Commissioner's decision be **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 31st day of October, 2013.

/s/Joe B. Brown
Joe B. Brown
United States Magistrate Judge